NO. 4-05-0943     Filed: 9/7/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| ERIC McKEE, | ) | Appeal from |
|      Plaintiff-Appellant, | ) | Circuit Court of |
|      v. | ) | Champaign County |
| THE BOARD OF TRUSTEES OF THE CHAMPAIGN | ) | No. 03MR392 |
| POLICE PENSION FUND, an Illinois | ) | |
| Administrative Agency; and WILLIAM | ) | |
| NEUMANN, MARK MEDLYN, DONALD ATKINS, | ) | |
| RICHARD SCHNUER, and VAN DUKEMAN, | ) | |
| Individually and as Members of the | ) | |
| Board of Trustees of the Champaign | ) | Honorable |
| Police Pension Fund, | ) | John R. Kennedy, |
|      Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE COOK delivered the opinion of the court:

Plaintiff, Eric McKee, a Champaign police officer, filed an application for disability benefits with the Board of Trustees of the Champaign Police Pension Board (Board). On May 21, 2003, the Board denied his application. Plaintiff filed a complaint for administrative review. The circuit court affirmed the Board's decision on October 13, 2005. Plaintiff appeals. We affirm.

I. BACKGROUND

At approximately 9:30 p.m. on September 15, 1998, plaintiff and other officers attempted to place a combative suspect in the rear of a squad car. Plaintiff testified that the morning of September 16 he woke up with severe back pain but did not associate the pain with picking up the suspect the night before. He called in sick for his shift that was to begin at 3 p.m. He called Dr. Robert Healy's office but was unable to get

an appointment until September 18.

On September 18, plaintiff saw K. Smitlyn, the nurse-practitioner at Dr. Healy's office. Smitlyn's notes state, "No known injury, but he did lift a man into his patrol car 2 days prior--no pain at that time. Played golf the next day and felt fine til he woke up the following day." Plaintiff testified he did not play golf September 16 and did not tell Smitlyn that he had; when Smitlyn asked about his exercise and recreational activities, plaintiff told her he played golf and was a scuba diver. Smitlyn wrote a note excusing plaintiff from work until September 21 and told him to take ibuprofen and call if he was not better in two weeks. On November 5, plaintiff saw Healy. On November 11, plaintiff underwent magnetic resonance imaging (MRI). The MRI indicated a bulging disc and a problem with the exiting nerve root. Plaintiff thereafter began to work light duty; in February 1999, he stopped working for the police department entirely.

On November 6, 1998, plaintiff filed a duty-injury report, stating he injured his lower back carrying the suspect on September 15 but did not realize he had hurt himself until the morning of September 16. He wrote that he had not filed a duty-injury report at that time because he believed the injury would heal after a few days. On April 23, 1999, plaintiff filed an application for disability benefits with the Board.

From November 1998 through August 2000, plaintiff saw nine physicians and two chiropractors. On December 2, 1998, Dr.

James J. Harms diagnosed a herniated disc at L4-L5 and saw "a little premature degenerative disc disease." Harms indicated most people start improving within 6 to 12 weeks and recommended temporary measures to help plaintiff's pain. On March 28 or 29, 1999, Harms again saw plaintiff. He wrote plaintiff was getting better but signed a certificate of disability at that time. Harms saw plaintiff in June 1999, after plaintiff underwent an epidural steroid injection. Harms wrote that if another injection did not help, plaintiff was a good candidate for surgery. Plaintiff underwent a second epidural injection in August 1999, which he reported aggravated his pain. On April 28, 2000, Harms wrote he could not tell how disabling plaintiff's injuries were; 80% of people with the condition get over it in a few months, but sometimes it takes longer.

At the request of the workers' compensation administrator, plaintiff saw Dr. Patrick A. Hogan on January 27, 1999. Hogan noted the MRI revealed a small disc herniation at L4-L5 on the left but concluded that "some occurrence regarding his golf or something that might have happened during the night" produced the disc herniation "since he was asymptomatic for 48 or more hours from the lifting incident." In a May 23, 2000, report, Hogan noted plaintiff had indicated the suggestion he had played golf was incorrect.

Dr. M.R. Carlson saw plaintiff on April 8, 1999, and reported a "possible annular ligament tear/possible small disc herniation" resulting in temporary disability. Carlson also

signed a certificate of disability.

Plaintiff saw Dr. Lawrence Leventhal on April 12, 1999. Leventhal reviewed the November 1998 MRI and diagnosed a bulging disc at L4-L5 on the left. He wrote, "It is medically probable that the injury on September 15, 1998, caused an annular tear to the disc at the L4-[L]5 level ***." "Based on [plaintiff's] history," Leventhal believed his current disability was a result of his employment. On August 16, 2000, Leventhal examined plaintiff and completed a physician's certificate certifying plaintiff was disabled for service in the police department. Leventhal stated the herniated disc could be treated surgically and there was a 75% to 80% chance plaintiff could return to duty after six months of rehabilitation, although no guarantees could be made.

Plaintiff was requested to see Dr. John Gragnani on April 18, 2000. Gragnani wrote plaintiff did not "show signs, either clinically or radiographically, of any particular changes that would explain the severe degree of pain he is reporting." Gragnini read Dr. Hogan's report and commented that plaintiff had not mentioned playing golf the morning after trying to lift the suspect into the patrol car. Gragnini recommended a second MRI and, after reviewing it, wrote there was nothing that would explain plaintiff's pain complaints and "[n]o residual impairments or disabilities would be expected as a result of the injury of 9/15/98."

On April 24, 2000, the Board's attorney, Charles H.

Atwell, Jr., wrote plaintiff's attorney, stating that the Board had designated Leventhal, Harms, Carlson, and Hogan as the selected physicians. See 40 ILCS 5/3-115 (West 1998). On November 14, 2001, Atwell wrote that Carlson had retired but the remaining three physicians had provided medical reports. Atwell noted that Harms had indicated that plaintiff should be referred to an occupational-medicine specialist, and as that was Gragnini's specialty, Atwell suggested that Gragnani be designated as a selected physician, along with Harms, Hogan, and Leventhal.

On May 30, 2000, plaintiff saw Dr. Michael L. Gernant, who diagnosed low-back pain with a herniated disc and nerve-root compression. He wrote, "At this point, I don't think [plaintiff] is able to perform his duties as a police officer *** concerning the injury he sustained on 9/15/98."

## II. THE BOARD'S DECISION

On May 21, 2003, the Board entered an order and decision denying plaintiff's request for disability benefits. Four members of the Board voted to deny benefits and one member abstained. The Board concluded plaintiff was not disabled, noting it "accords great weight" to Hogan and Gragnini's "detailed opinions." As an independent reason for denying plaintiff's claim, the Board also cited section 3-115 of the Pension Code (40 ILCS 5/3-115 (West 1998)), which requires that three physicians the Board selects must certify an applicant is, in fact, disabled. The Board found that of the four physicians it

selected, Harms, Hogan, Leventhal, and Gragnini, only Leventhal and Harms suggested plaintiff was unable to perform his job as a police officer.

In an alternative holding, the Board stated that even if plaintiff had proved he is disabled, he did not establish the incident on September 15, 1998, was the cause of his alleged disability. The Board further noted plaintiff had made no request in the alternative for a nonduty-disability pension benefit.

The Board also remarked that plaintiff "continues to disdain any surgery which has been recommended by Dr. Leventhal and Dr. Gernant, who have both expressed a likelihood of 80-85% success rate, with the ultimate result to return to full service as a police officer." While the Board denied it considered plaintiff's decision to forego surgery in coming to its decision, it noted that "even the two physicians who have expressed their opinions that [plaintiff] is disabled from performing full service have stated that there is a high probability that minor surgery could relieve [p]laintiff of his alleged discomfort."

Plaintiff filed a complaint for administrative review, and the circuit court affirmed. This appeal followed.

### III. ANALYSIS

#### A. Standard of Review

Judicial review of the decision of the Board is governed by the Administrative Review Law. 735 ILCS 5/3-101 through 3-113 (West 2002). The factual findings of the administrative

agency are considered to be prima facie correct (735 ILCS 5/3-110 (West 2002)) and will be reversed only if against the manifest weight of the evidence. Questions of law are reviewed de novo. Marconi v. Chicago Heights Police Pension Board, 361 Ill. App. 3d 1, 16, 836 N.E.2d 705, 719 (2005). A mixed question of law and fact, however, is not reviewed de novo, but under the clearly erroneous standard. The clearly-erroneous standard of review is "between a manifest[-]weight[-]of[-]the[-]evidence standard and a de novo standard so as to provide some deference to the [agency's] experience and expertise." City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 205, 692 N.E.2d 295, 302 (1998).

### B. Section 3-115

Plaintiff argues that section 3-115 of the Pension Code has not been complied with in this case. Section 3-115 provides:

> "A disability pension shall not be paid
> unless there is filed with the board certi-
> ficates of the police officer's disability,
> subscribed and sworn to by the police officer
> if not under legal disability *** and by the
> police surgeon (if there be one) and 3 prac-
> ticing physicians selected by the board. The
> board may require other evidence of disability."
> 40 ILCS 5/3-115 (West 1998).

The certification requirement is an antifraud provision and serves the legitimate legislative goal of ensuring the integrity

of the pension fund.  <u>Trettenero v. Police Pension Fund of the</u> <u>City of Aurora</u>, 333 Ill. App. 3d 792, 799, 776 N.E.2d 840, 847 (2002).

Plaintiff argues that, as a matter of law, the Board was required to find him disabled because three Board-selected physicians, Leventhal, Harms, and Carlson, signed certificates of disability.  In response, the Board argues that Carlson had been replaced and that plaintiff's claim must accordingly be denied because only two physicians had certified that plaintiff was disabled.  That argument was an alternative to the Board's primary finding that plaintiff was not disabled.  Plaintiff also argues that Hogan and Gragani, who examined him at the request of the city's workers' compensation management company, were not Board-selected physicians because he never stipulated that they were and because they did not sign certificates of disability. Plaintiff also argues, for the first time on appeal, that the Board's rules provide for the selection of only three physicians. He supplemented the administrative record with the Board's rules, which state that the Board "shall designate up to three (3) physicians" to examine the applicant.

If section 3-115 were interpreted to require that the Board's three selected physicians unanimously declare an applicant disabled, one physician's opinion that an applicant was not disabled would <u>ipso</u> <u>facto</u> defeat a pension claim, thus rendering section 3-115 a virtual summary-dismissal provision.  <u>Coyne v.</u> <u>Milan Police Pension Board</u>, 347 Ill. App. 3d 713, 729, 807 N.E.2d

1276, 1289 (2004). (A similar concern arises if section 3-115 is interpreted to mean that the mere existence of three certificates of disability automatically deems an applicant disabled, regardless of what other medical and nonmedical evidence reveals.)

> "A pension board would have no use for an evidentiary hearing in such cases because, regardless of the weight of the claimant's evidence, and regardless of any credibility issues pertaining to the lone dissenting physician, the outcome of the case would be predetermined by the mere existence of a disagreement between witnesses." Coyne, 347 Ill. App. 3d at 729, 807 N.E.2d at 1289.

The Third District, in Coyne, found the board's summary dismissal for lack of three certificates to be unconstitutional and reversed and remanded the board's denial of benefits, agreeing with the circuit court that section 3-115 only required three medical certificates "addressing" the applicant's disability status. Coyne, 347 Ill. App. 3d at 727-28, 807 N.E.2d at 1288. The Third District disagreed with Justice Schmidt's dissenting opinion that the board could simply appoint a fourth physician to get the necessary three certificates. Coyne, 347 Ill. App. 3d at 729, 807 N.E.2d at 1289.

The Second District, following remand from the supreme court, has found a board's determination that an applicant was not disabled to be against the manifest weight of the evidence

but nevertheless affirmed the denial of benefits because the board did not receive three certificates of disability. The Second District agreed with Justice Schmidt's dissent. Under the clear language of section 3-115, three physicians selected by the board must furnish certification that the applicant has a disability preventing him from performing any assigned duty or duties in the police service. Wade v. City of North Chicago Police Pension Board, 359 Ill. App. 3d 224, 236, 833 N.E.2d 427, 437 (2005). Nothing in the statute, however, precludes the board from appointing additional physicians to examine the applicant in an effort to secure the necessary three certificates. Wade, 359 Ill. App. 3d at 236, 833 N.E.2d at 438.

The First District disagreed with both the Coyne majority and with Justice Schmidt's dissent. Under Coyne, "the certification requirement is reduced to a mere empty formality-- even three certificates stating that an applicant is not disabled would satisfy the statute." (Emphasis in original.) Marconi, 361 Ill. App. 3d at 23, 836 N.E.2d at 725. Justice Schmidt's suggestion that additional physicians be appointed, however, was viewed by the First District as too extensive a legislative revision. "Such attempted judicial interpolations would be in open contravention to the express language of the statute." Marconi, 361 Ill. App. 3d at 29, 836 N.E.2d at 729. In Marconi, two of the three board-selected physicians certified the plaintiff was disabled, as did a fourth physician, who was not selected by the board. However, because the board's finding of

˅ 10 ˅

fact that the plaintiff was not disabled was clearly erroneous, the First District reversed the board's ruling, even though only two of the selected physicians had filed a certificate of disability.

We agree with previous decisions that an applicant cannot be awarded disability benefits unless three physicians have filed a certificate of disability. <u>Daily v. Board of Trustees of the Police Pension Fund of Springfield, Illinois</u>, 251 Ill. App. 3d 119, 126-27, 621 N.E.2d 986, 991 (1993). The three certificates are a precondition to the case going forward, and in a simple case, may provide an adequate basis for granting (or denying) a claim. If three certificates cannot be obtained, the claim may be summarily dismissed. Three certificates from board-selected physicians were obtained in this case, despite the fact that Carlson had retired. The presence of three certificates, however, is not dispositive. "The board may require other evidence of disability" in addition to the three certificates. 40 ILCS 5/3-115 (West 1998). Factual disputes cannot be resolved by the mechanical counting of certificates but must depend on findings made by the board. See <u>Turcol v. Pension Board of Trustees of the Matteson Police Pension Fund</u>, 214 Ill. 2d 521, 828 N.E.2d 277 (2005) (dismissing appeal and remanding for appellate court to consider whether board's denial of benefits may be confirmed on the ground that plaintiff failed to prove his disability); <u>Wade v. City of North Chicago Police Pension Board</u>, 215 Ill. 2d 620, 828 N.E.2d 282 (2005) (same).

Unanimity among the three physicians selected by the board is not required. The Board may, in an appropriate case, select additional physicians who may file certificates. We do not read section 3-115 to prohibit the Board's selection of more than three physicians to sign certificates, particularly in light of the language, "[t]he board may require other evidence of disability" in addition to the three certificates. 40 ILCS 5/3-115 (West 1998). Section 3-115 does not contain any formal procedure for the Board's selection of physicians. Selection is left to the Board's discretion, but that discretion may be abused where the Board chooses "to preselect those doctors whose negative position on the issue of disability has been firmly established." Marconi, 361 Ill. App. 3d at 27, 836 N.E.2d at 727. There is no indication the Board's discretion was abused in this case. Harms, Carlson, and Leventhal were initially chosen by plaintiff and presented his point of view. Hogan and Gragnini appear to be well-qualified physicians, practicing in the particular field.

Certificates of the police officer's disability, subscribed and sworn to by three practicing physicians, are necessary before a disability pension is paid, but there is no such requirement if the pension is not paid. Rizzo v. Board of Trustees of the Village of Evergreen Park Police Pension Fund, 338 Ill. App. 3d 490, 494-95, 788 N.E.2d 1196, 1200 (2003); Daily, 251 Ill. App. 3d at 127, 621 N.E.2d at 991. A physician who testifies that a police officer is not disabled cannot be

expected to sign a certificate of disability.

In this case, the physician's certificates reveal only a part of the picture. Of the five physicians who were, at one time or another, designated as Board-selected, two flatly stated that plaintiff was not disabled. Two others, Carlson and Harms, certified that plaintiff was disabled, but their accompanying records indicate they believed plaintiff's injury was not severe. Viewing the totality of the evidence before the Board, we cannot say that its determination that plaintiff was not disabled is against the manifest weight of the evidence. The Board was not required to find plaintiff disabled simply because three physicians certified that he was.

## C. Other Arguments

Plaintiff argues the Board improperly refused to consider a nonduty-disability pension. The Board, however, concluded that plaintiff did not prove the existence of a physical or mental disability rendering his retirement necessary. Even if plaintiff had specifically requested a nonduty-disability pension in the alternative, the Board could not have granted one. The fact that the Board noted plaintiff had not requested a nonduty-disability pension is of no significance here.

Plaintiff claims he was denied due process when the Board conducted deliberations in a closed session in contravention of the Illinois Open Meetings Act (Act) (5 ILCS 120/2 (West 2004)) and the Board's own rules and regulations. One of the exceptions to the Act allows the consideration of:

"(4) Evidence or testimony presented in open hearing, or in closed hearing where specifically authorized by law, to a quasi-adjudicative body, as defined in this Act, provided that the body prepares and makes available for public inspection a written decision setting forth its determinative reasoning."  5 ILCS 120/2(c)(4) (West 2004).

It would have been better if the Board had explicitly referred to this specific subsection, but generally calling attention to the exception was sufficient.  Henry v. Anderson, 356 Ill. App. 3d 952, 955, 827 N.E.2d 522, 524 (2005).  The Board's rules and regulations provide that, on motion, the Board may go to closed session pursuant to an exception set forth under the Act.  The Board, therefore, did not violate its own rules and regulations by holding a closed meeting.

Plaintiff claims he was denied due process because Atwell, the Board's attorney, acted as a hearing officer and a prosecutor, attended the closed session, participated in the Board's deliberations, and prepared the decision and order for the Board's members signatures, citing Thurow v. Police Pension Board of the Village of Fox Lake, 180 Ill. App. 3d 683, 536 N.E.2d 155 (1989).  The Board's attorney here cross-examined witnesses and made objections, but there is no evidence that he played a role in determining the outcome of the application or that plaintiff was otherwise denied a fair hearing.

Finally, plaintiff challenges the Board's reference to his decision to forego surgery. Here, plaintiff's decision to forego back surgery was not unreasonable. There was no evidence that the surgery would be "minor." Leventhal gave a 75% to 80% success rate but added that plaintiff would have to endure six months of rehabilitation "with no guarantees." Even so, the Board specifically stated that it did not take plaintiff's decision not to undergo surgery into consideration in making its determination.

## IV. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

STEIGMANN and McCULLOUGH, JJ., concur.